IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| JEFFERY SCHROEDER,<br><br>        Plaintiff,<br><br>  v.<br><br>ALLISON ARMSTRONG, GEORGE KRAL, JEREMY VEDRA, ROBERT THOMAS, MATTHEW SHIPLE, ANTWOINE MISTER & CITY OF TOLEDO,<br><br>        Defendants. | Case No. _____<br><br>Judge _____<br><br>**Complaint with Jury Demand** |

## I. Introduction

1.     This lawsuit to remedy violations of Plaintiff Jeffery Schroeder's civil rights guaranteed by the First Amendment to the U.S. Constitution and Ohio common law arising from the misconduct of Defendants the City of Toledo, Toledo Fire Chief Allison Armstrong, Toledo Safety Director George Kral, Battalion Chief Jeremy Vedra, Battalion Chief Robert Thomas, Captain Matthew Shiple, and Lieutenant Antwoine Mister.

2.     These Defendants unlawfully retaliated against Plaintiff and terminated his decades-long employment with the Toledo Fire and Rescue Department based on his constitutionally protected political speech on a matter of public concern.

3.     Defendants have purported to base Schroeder's termination on a single Facebook comment he posted to his personal account during off-hours that criticized Charlie Kirk, a prominent and divisive political commentator and activist who was assassinated in September 2025. Schroeder's comment, which he made before he learned of Kirk's death from the shooting, expressed in whole that the shooting was "[t]otally preventable and avoidable if not for the policies and beliefs like

Charlie Kirk and his uneducated hateful ilk," and that Schroeder "[w]ish[ed] the guy was a better shot," because "Kirk offers nothing but hate and division to society… and discourse would be better without him."

4. The statement for which Defendants have purported to terminate Schroeder communicated his opinion that the world would be better off without Kirk's divisive and hateful influence on public discourse. This was fundamental political speech that is protected under the First Amendment as confirmed by clearly established precedent from the Sixth Circuit and Supreme Court of the United States, and which leaves no doubt that Defendants' decision to terminate Schroeder's employment constitutes an actionable violation of his First Amendment rights. *See, e.g.*, *Watts v. United States*, 394 U.S. 705, 705 (1969) (statement that "if they ever make me carry a rifle the first man I want to get in my sights is L.B.J." was constitutionally protected political hyperbole, rather than a true "threat" against the President of the United States); *Noble v. Cincinnati & Hamilton Cty. Pub. Libr.*, 112 F.4th 373, 384 (6th Cir.2024), fn. 3 ("*Rankin* recognizes a wide parameter of protected speech, even allowing for hyperbole that references deadly violence. … [I]t is our duty to enforce the full scope of First Amendment protection in a consistent fashion and without regard to which side of the political aisle is offended by the speech."), discussing *Rankin v. McPherson*, 483 U.S. 378 (1987).

5. Defendants' termination of Schroeder constitutes an especially egregious First Amendment violation because Defendants have purported to justify their actions primarily with claims about how members of the public "interpreted" his post, and that it "resulted in widespread public outrage and condemnation, with over one thousand complaints from the public," after another highly divisive and influential public figure—Chaya Raichik, the owner of the widely followed "Libs of TikTok" social media accounts—was forwarded Schroeder's comment and shared it with her millions of followers, urging them to contact the Toledo Fire Department to demand his termination.

6. Allowing Schroeder's termination to stand under these circumstances would be to accept that our government can take any action at all in response to its employees' political opinions as long as there are influential political figures who can rally enough of their followers to express their disagreement with those opinions. Such a phenomenon has been recognized by the Sixth Circuit as a "heckler's veto," which, if permitted to be enforced by government officials like the Defendants here, would result in the precisely the type of "odious viewpoint discrimination that cuts to the First Amendment's core." *Defending Edn. v. Olentangy Local School Dist. Bd. of Edn.*, 6th Cir. No. 23-3630, 2025 U.S. App. LEXIS 29181, at *29-32 (Nov. 6, 2025), quoting *Bible Believers v. Wayne County*, 805 F.3d 228, 248 (6th Cir. 2015) (*en banc*).

7. To hold otherwise would be to cede our public discourse to extremists and those who hold the most power over the flow of information, which would inevitably result in uniformity of opinion in our public offices and provide a license for precisely the type of governmental tyranny that the First Amendment was designed to protect against. *See, e.g.*, *Snyder v. Phelps,* 562 U.S. 443, 452, 131 S.Ct. 1207, 179 L.Ed.2d 172 (2011) ("The First Amendment reflects a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open. That is because speech concerning public affairs is more than self-expression; it is the essence of self-government. Accordingly, speech on public issues occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection.") (internal citations and punctuation omitted); *United States v. Alvarez,* 567 U.S. 709, 723, 132 S.Ct. 2537, 183 L.Ed.2d 574 (2012) ("[F]ree speech, thought, and discourse are … a foundation of our freedom.").

8. Defendants' conduct also gives rise to a claim under Ohio law for wrongful termination in violation of public policy, as set forth fully herein.

## II. Jurisdiction & Venue

9. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343 for the claims raised under 42 U.S.C. § 1983 and supplemental jurisdiction pursuant to 28 U.S.C. § 1367 for claims raised under Ohio law.

10. This Court has jurisdiction over Defendants because they are residents or political subdivisions of the State of Ohio.

11. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because the acts upon which the claims in this litigation are based and the damages resulting therefrom occurred in Lucas County, Ohio.

## III. Parties

12. Plaintiff is a resident of the City of Toledo, Lucas County, Ohio.

13. Defendant Allison Armstrong is and was at all relevant times the Chief of the Toledo Fire and Rescue Department ("the Department") and is a resident of Waterville, Ohio. She is sued in her individual capacity.

14. Defendant George Kral is and was at all relevant times the Safety Director of the City of Toledo and is a resident of Toledo, Ohio. He is being sued in his individual capacity.

15. Defendant Jeremy Vedra was at all relevant times a Battalion Chief in the Department and is a resident of Toledo, Ohio. He is sued in his individual capacity.

16. Defendant Robert Thomas is and was at all relevant times a Battalion Chief in the Department and is a resident of Toledo, Ohio. He is sued in his individual capacity.

17. Defendant Matthew Shiple is and was at all relevant times a Captain in the Department and is a resident of Toledo, Ohio. He is sued in his individual capacity.

18. Defendant Antwoine Mister is and was at all relevant times a Lieutenant in the Department and is a resident of Toledo, Ohio. He is sued in his individual capacity.

19. Defendant City of Toledo is a municipal corporation in Lucas County, Ohio.

## IV. Facts

20. Plaintiff Jeffery Schroeder, a Lieutenant with the Toledo Fire and Rescue Department ("the Department"), was terminated by Defendanrts after 28 years of distinguished service to the Department, and 35 years of such service to the City of Toledo, due to a single comment he made on Facebook.com, off-hours, and in his personal capacity, about a matter having nothing to do with the Department or Schroeder's job responsibilities. Rather, Schroeder's Facebook comment pertained to the shooting of the prominent and controversial political commentator and activist Charlie Kirk, an act of political violence that became the subject of much national discourse, and which resulted in Kirk's widespread memorialization by the nation's most prominent politicians, public officials, and news outlets.

21. Kirk was in fact extremely divisive in his influence on public life in this nation, as illustrated by the following statements *The Guardian* published in the wake of his death:[1]

- "I think it's worth it to have a cost of, unfortunately, some gun deaths every single year so that we can have the second amendment to protect our other God-given rights. That is a prudent deal. It is rational." April 5, 2023, during event organized by TPUSA Faith, the religious arm of Kirk's conservative group Turning Point USA

- "If I see a Black pilot, I'm going to be like, boy, I hope he's qualified." Jan. 23, 2024, on *The Charlie Kirk Show*

- "Happening all the time in urban America, prowling Blacks go around for fun to go target white people, that's a fact. It's happening more and more." May 19, 2023, on *The Charlie Kirk Show*

- "If we would have said that Joy Reid and Michelle Obama and Sheila Jackson Lee and Ketanji Brown Jackson were affirmative action picks, we would have been called racists. Now they're coming out and they're saying it for us … You do not have the brain processing power to otherwise be taken really seriously. You had to go steal a white person's slot to go be taken somewhat seriously." July 13, 2023, on *The Charlie Kirk Show*

- "Reject feminism. Submit to your husband, Taylor. You're not in charge." Aug. 26, 2025, discussing news of Taylor Swift and Travis Kelce's engagement on *The Charlie Kirk Show*

---

[1] Chris Stein, *Charlie Kirk in His Own Words: 'Prowling Blacks,' and 'The Great Replacement Strategy'*, THE GUARDIAN (Sept. 11, 2025), www.theguardian.com/us-news/2025/sep/11/charlie-kirk-quotes-beliefs.

- "America was at its peak when we halted immigration for 40 years and we dropped our foreign-born percentage to its lowest level ever. We should be unafraid to do that." Aug. 22, 2025, on *The Charlie Kirk Show*

- "The American Democrat party hates this country. They wanna see it collapse. They love it when America becomes less white." March 20, 2024, on *The Charlie Kirk Show*

- "America has freedom of religion, of course, but we should be frank: large dedicated Islamic areas are a threat to America." April 30, 2025, on *The Charlie Kirk Show*

- "We've been warning about the rise of Islam on the show, to great amount of backlash. We don't care, that's what we do here. And we said that Islam is not compatible with western civilization." June 24, 2025, on *The Charlie Kirk Show*

22. Reflecting on Kirk's memorialization, one widely acclaimed author and social commentator Ta-Nehisi Coates wrote in *Vanity Fair* that "[b]y ignoring the rhetoric and actions of the Turning Point USA founder, pundits and politicians are sanitizing his legacy."[2] Coates noted that Kirk "left a compendium of words" before he was killed, and that "[i]t is somewhat difficult to match these words with the manner in which Kirk is presently being memorialized in mainstream discourse" given that he "reveled in open bigotry" and "endorsed hurting people to advance his preferred policy outcomes." Coates accordingly suggested that "the hard question must be asked: If you look away from the words of Charlie Kirk, from what else would you look away?"

23. To that effect, after having heard about Kirk's shooting, but not knowing of his death, on September 10, 2025, Plaintiff Schroeder commented from his personal Facebook account on a post by the local ABC affiliate WTVG about the shooting. Schroeder's post stated, in full, as follows:

> "Thoughts and prayers. Totally preventable and avoidable if not for the policies and beliefs like Charlie Kirk and his uneducated hateful ilk. Wish the guy was a better shot. Charlie Kirk offers nothing but hate and division to society. No one would miss him and discourse would be better without him."

---

[2] Ta-Nehisi Coates, *Charlie Kirk, Redeemed: A Political Class Finds Its Lost Cause*, VANITY FAIR (Sept. 16, 2025), https://www.vanityfair.com/news/story/charlie-kirk-ezra-klein-tanehisi-coates?srsltid=AfmBOop8RRMJ4sqrbNVzCZT3whTD8yc03hPFqTYQ4fks4RCB--mwl0sp.

24. When Schroeder published this comment, he was not at work, and it was not during any hours when he was supposed to be at work. In fact, Schroeder was on vacation published the post from a personal device, as a private citizen, and not pursuant to any official duties.

25. Schroeder's comment had only been published for about 20 minutes before the President of the Toledo Firefighters Local 92 Union, Joe Cira, called Schroeder to notify him that Chief Armstrong had contacted Cira about it. Armstrong asked Cira to contact Schroeder to demand that he delete his comment from the WTVG Facebook post. Fearing further retaliation (apart from the fact that the Fire Chief had demanded that he retract his speech in the first place), Schroeder deleted the comment from the WTVG post. In total, the comment remained published for about 30 minutes.

26. On September 11, 2025, the day after Schroeder published this post (in which he communicated his fundamentally political and Constitutionally protected opinion that the world would be better off without Kirk's divisive and hateful influence on public discourse), another highly influential and divisive political figure, Chaya Raichik, who runs the "Libs of TikTok" social media accounts, that are described by Wikipedia as "anti-LGBTQ" and "far-right," and which have millions of followers, inquired of the Department's Battalion Chief, Defendant Jeremy Vedra, about Schroeder's post, and the Department's "social media policy."

27. On information and belief, one of the Defendants, or another member of the Toledo Fire Department known to the Defendants, had submitted Schroeder's post to Raichik—along with a photo of Schroeder pulled from his Facebook page (which was accessible only to Schroeder's Facebook "friends") and other information about his position with the Department—for the precise purpose of creating a pretext for subjecting Schroeder to unwarranted and unconstitutional discipline in response to the post. On information and belief, the Defendants all knew, before acting to impose discipline on Schroeder, that Raichik had received the information about Schroeder's post from a source inside of the Department.

7

28. Despite having no obligation to respond to Raichik's inquiry, Defendant Vedra sent Raichik an email stating that the "comment in question [wa]s under investigation." Vedra also included his phone number in this email.

29. Raichik then posted Vedra's email to her social media account, along with Schroeder's post, and information pertaining his employment, soliciting her millions of followers to contact the Department at Vedra's number.



**Exhibit 1**

30. As a result of Raichik posting on her "Libs of TikTok," account, Schroeder's comment was widely disseminated and, according to the Department, it received approximately one thousand complaints from the public.

31. Despite these complaints that were instigated by Raichik, Plaintiff worked 24-hour shifts on September 11–12 and September 14–15, respectively, without incident and without any material disruption to the operations of the Fire Department.

32. On the afternoon of September 15, Plaintiff was informed that the Department was placing him on administrative leave pending further investigation of his Facebook comment.

33. Shortly thereafter, Defendant Vedra, the then-Chief of the Department's Bureau of Professional Standards, charged Schroeder with four violations of the Department's Rules and Regulations solely based on that Facebook comment. *See* **Exhibit 2**, Nov. 12, 2025, Hearing Findings. Defendant Vedra oversaw the disciplinary investigation.

34. An administrative hearing was held on these charges on October 29, 2025. Defendant Allison Armstrong, the Fire Chief, was present as the hearing officer, and Defendant Robert Thomas, a Battalion Chief who assumed Vedra's role as Chief of the Department's Bureau of Professional Standards, Matthew Shiple, a Captain, and Antwoine Mister, a Lieutenant, presented the case against Schroeder.

35. Defendant Armstrong found Schroeder guilty of three of the violations, which included that Schroeder participated in "conduct detrimental, prejudicial, or subversive to the good order and discipline of the Department," violated the administrative policy against social media that "could jeopardize the health, wellness and/or security of any individual employed by the City of Toledo," and violated a policy against the "harmful use of social media." *See* **Exhibit 2**, Nov. 12, 2025, Hearing Findings, at 1-3.

36. According to Armstrong, who acknowledged that at the time Schroeder made the comment, he was "off duty and did not know that Mr. Kirk was murdered," the Facebook post was "widely

9

disseminated across the world," and was "insensitive and interpreted as an endorsement of political violence against a public figure," resulting "in widespread public outrage and condemnation, with over one thousand complaints from the public." *Id.* at 4. Armstrong claimed that an "inundation of calls, emails, messages, and comments received because of [Schroeder's post] caused significant disruption to department operations," and Vedra, whose name and phone number were included in the "Libs of TikTok" viral post, "received hundreds of harassing phone calls and threats and was unable to perform his job duties temporarily," "had to change his office phone number," and "feared for his safety and had to alter his work habits to address these safety concerns." *Id.* at 4-5. "[N]umerous other department members and Engage Toledo customer service representatives received rude and harassing phone calls and emails." *Id.* at 5.

37. Armstrong also asserted that the Department's "social media pages were also inundated with negative comments, complaints, and tags in response to [Schroeder's] actions," that were described as "'hateful,' 'inhumane,' 'insensitive,' 'vile,' 'disgusting,' 'evil,' 'horrific,' 'heartless,' 'unprofessional,' 'horrible,' 'abhorrent,' 'incites violence,' 'disturbing,' 'offensive,' 'unacceptable,' and 'unethical.'" *Id.* According to Armstrong, the "department [was required] to implement station lockdowns and increased security measures," because of the post, which also "created frustration and distress amongst employees within the department, undermining department morale and safety." *Id.*

38. In truth, Schroeder's comment did not cause any material disruption to the Toledo Fire Department's operations. Any such acts taken by the Department outside of its normal operations either did not constitute a material disruption, and/or resulted from the Department's own unreasonable decisions.

39. Even if the Department's receipt of the referenced "complaints from the public" could be reasonably characterized as a "material disruption" to the Department's operations, it is well-established that "the government typically may not ban speech simply because the audience will respond" in a particular way, including with "violence or threats or other unprivileged retaliatory

10

conduct." *Defending Edn. v. Olentangy Local School Dist. Bd. of Edn.*, 6th Cir. No. 23-3630, 2025 U.S. App. LEXIS 29181, at *29-32 (Nov. 6, 2025), quoting *Zamecnik v. Indian Prairie Sch. Dist. No. 204*, 636 F.3d 874, 879 (7th Cir. 2011). This is because, "if [the Toledo Fire Department] enforced this type of 'heckler's veto' (barring speech because of an audience's reaction), they would commit the 'odious viewpoint discrimination' that cuts to the First Amendment's core." *Id.*, quoting *Bible Believers v. Wayne County*, 805 F.3d 228, 248 (6th Cir. 2015) (en banc) ("An especially 'egregious' form of content-based discrimination is that which is designed to exclude a particular point of view from the marketplace of ideas. … The heckler's veto is precisely that type of odious viewpoint discrimination. … A review of Supreme Court precedent firmly establishes that the First Amendment does not countenance a heckler's veto.").

40. Based on the three "guilty" findings she made after Schroeder's disciplinary hearing, on November 12, 2025, Defendant Armstrong nevertheless immediately terminated Schroeder's employment as a City of Toledo Fire Lieutenant after decades of service.

41. In his capacity as the City of Toledo's Safety Director, Defendant George Kral sustained Armstrong's decision to terminate Schroeder, and finalized his removal from the Department.

### V. Causes of Action

**Count 1**
**Retaliatory Termination**
**First Amendment and 42 U.S.C. § 1983**

42. Plaintiff incorporates the previous allegations by reference.

43. This Count 1 is alleged against Defendants Armstrong, Kral, Vedra, Thomas, Shiple, and Mister.

44. As a public employee, Schroeder had a right to communicate his political opinion regarding a divisive public figure like Charlie Kirk under the First Amendment of the U.S. Constitution and to be free from government retaliation against him for such speech.

11

45. Schroeder's post, for which he was terminated, was made in his personal capacity, as a private citizen during off-hours, and was not made pursuant to any official duties.

46. Schroeder's post pertained to his opinion of the controversial right-wing activist Charlie Kirk and his shooting, a matter of public concern.

47. Schroeder's interest as a citizen, in commenting upon matters of public concern such as the life and death of a controversial figure like Kirk, outweighed the interest of the City here in promoting the efficiency of the public services it performs through its employees.

48. Indeed, Schroeder's political views on Kirk did not influence his work as a Toledo Fire Lieutenant, impede his performance of his duties, impair discipline, detrimentally impact working relationships within the Department, or materially interfere with the Department's operation. *See Noble v. Cincinnati & Hamilton Cty. Pub. Libr.*, 112 F.4th 373, 382 (6th Cir. 2024) ("[T]he Library fired [plaintiff] for a post made on his private Facebook page while he was at home and not working, which raises more First Amendment red flags. There is no evidence that [plaintiff] took his politics to work or that his views on … BLM protests or any other political matter ever interfered with how he performed his job.").

49. In fact, any disruption that occurred as a result of Schroeder's mere expression of his political opinion—including the "over one thousand complaints from the public" via "phone calls," "emails," and "social media" comments, and the Department's decision to respond to those complaints by implementing "station lockdowns and increased security measures"—— could not possibly warrant Defendants' decision to impose any discipline on Schroeder for this expression. *See, e.g., Watts, Noble, Rankin, Olentangy Local School Dist., Bible Believers, supra. See also Scarbrough v. Morgan Cty. Bd. of Edn.*, 470 F.3d 250, 258 (6th Cir. 2006) ("[T]he detrimental impact on the work environment results directly from [plaintiff's] intended speech and his religious beliefs. It would contravene the intent of the First Amendment to permit the [defendant] effectively to terminate [plaintiff] for his speech and religious beliefs in this way."); *Fulton v. City of Philadelphia*, 593 U.S. 522,

615 (2021) ("In an open, pluralistic, self governing society, the expression of an idea cannot be suppressed simply because some find it offensive, insulting, or even wounding."); *Hurley v. Irish-American Gay*, 515 U.S. 557, 579 (1995) ("[T]he law … is not free to interfere with speech for no better reason than promoting an approved message or discouraging a disfavored one, however enlightened either purpose may strike the government"); *Texas v. Johnson*, 491 U.S. 397, 414 (1989) ("If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable"); *Street v. New York*, 394 U. S. 576, 592 (1969) ("[T]he public expression of ideas may not be prohibited merely because the ideas are themselves offensive to some of their hearers"); *Coates v. Cincinnati*, 402 U. S. 611, 615 (1971) ("Our decisions establish that mere public intolerance or animosity cannot be the basis for abridgment of . . . constitutional freedoms"); *Myers v. City of Centerville*, 41 F.4th 746, 760 (6th Cir.2022) ("Speech concerns such matters 'when it is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public.'"); *Whitney v. City of Milan*, 677 F.3d 292, 298-299 (6th Cir.2012) (where "employee's speech substantially involved matters of public concern," the "employer may be required to make a particularly strong showing that the employee's speech interfered with workplace functioning before taking action").

50. Defendants Vedra, Thomas, Shiple, and Mister wrongfully retaliated against Schroeder for his protected political speech by charging him in an administrative proceeding based solely on his Facebook comment about Kirk, to effectively cause his termination.

51. Defendant Armstrong wrongfully retaliated against Schroeder for his protected political speech by terminating his long-held employment with the City of Toledo based solely on his Facebook comment about Kirk.

52. Defendant Kral wrongfully retaliated against Schroeder for his protected political speech by finalizing Schroeder's removal from the Department based solely on his Facebook comment about Kirk.

53. These adverse actions by Defendants would chill a person of ordinary firmness from engaging in protected political speech.

54. By their actions alleged herein, taken under color of law, Defendants deprived Schroeder of his right to be free from retaliation for exercising his First Amendment rights.

55. As a direct and proximate result of this unlawful and unconstitutional conduct, which was intentional and showed a spirit of ill-will, hatred, and wanton disregard for Schroeder's rights, Schroeder has suffered and will continue to suffer economic and non-economic damages for which Defendants are liable, including, but not limited to, mental, emotional, and physical pain and suffering. Schroeder is also entitled to punitive damages based on this unlawful and unconstitutional conduct.

**Count 2**
**Unconstitutional Custom, Policy, and Practice**
**First Amendment, 42 U.S.C. § 1983 & *Monell v. Dept. of Social Services of the City of New York*, 436 U.S. 658 (1978)**

56. Plaintiff incorporates the previous allegations by reference.

57. This Count 2 is alleged the City of Toledo, which ordered, tolerated, or permitted Schroeder's unlawful termination in retaliation for practicing his First Amendment rights.

58. The retaliatory acts against Schroeder constituted the implementation of official municipal policy, custom, or practice by the City and its public officials.

59. Alternatively, the City of Toledo was deliberately indifferent to a pattern and practice whereby its officials retaliate against individuals for communicating First Amendment protected political speech.

14

60. Thus, the City of Toledo, through this unconstitutional custom, policy, and practice, has deprived Schroeder of his First Amendment rights, as set forth in Count 1.

61. As a direct and proximate result of this unlawful and unconstitutional conduct, which was intentional and showed a spirit of ill-will, hatred, and wanton disregard for Schroeder's rights, Schroeder has suffered and will continue to suffer economic and non-economic damages for which the City of Toledo is liable, including, but not limited to, mental, emotional, and physical pain and suffering. Schroeder is also entitled to punitive damages based on this unlawful and unconstitutional conduct.

## Count 3
## Wrongful Termination in Violation of Ohio Public Policy

62. Plaintiff incorporates the previous allegations by reference.

63. This Count 3 is alleged against Defendants Armstrong, Kral, Vedra, Thomas, Shiple, Mister, and the City of Toledo.

64. Ohio public policy protects free speech, including political speech, from adverse state action, as clearly reflected by both the Ohio and United States First Amendment.

65. Schroeder's dismissal by Defendants, which was executed under the color of law and solely based on Schroeder communicating his opinion that the world would be a better place without Charlie Kirk, jeopardizes this Ohio policy.

66. Schroeder's dismissal by Defendants was solely motivated by his single Facebook comment related to Kirk, which was protected speech.

67. The Defendants lacked an overriding legitimate justification to dismiss Schroeder after decades of service.

68. As a direct and proximate result of this wrongful termination, Schroeder has suffered and will continue to suffer economic and non-economic damages for which Defendants are liable, including, but not limited to, mental, emotional, and physical pain and suffering.

## VI. Prayer for Relief

Wherefore, Plaintiff Jeffrey Schroeder respectfully prays for judgment against Defendants in an amount in excess of $75,000.00 together with punitive damages, attorneys' fees, costs, expenses, and any other relief to which Plaintiff may be entitled or that the Court deems equitable and just.

## VII. Jury Demand

Plaintiff Jeffrey Schroeder demands a trial by jury on all issues within the Complaint.

Respectfully submitted,

*/s/ Peter Pattakos*
Peter Pattakos (0082884)
   *peter@pattakoslaw.com*
Zoran Balac (0100501)
   *zbalac@pattakoslaw.com*
Gregory Gipson (0089340)
   *ggipson@pattakoslaw.com*
Maryam Assar (0104229)
   *massar@pattakoslaw.com*

THE PATTAKOS LAW FIRM LLC
5324 Fleet Ave, 2nd Floor
Cleveland, Ohio 44105
P: 330.836.8533|F: 330.836.8536

*Attorneys for Plaintiff Jeffrey Schroeder*